Morning, Your Honors. My name is Nicholas Brawney. I'm the Solicitor General of Arkansas and I'm here on behalf of the Arkansas Secretary of State who's the defendant here. May it challenge is ultimately whether a reasonably diligent third party could be expected to comply with a requirement. The District Court did not apply that standard. The District Court did not even mention that standard. Instead, it asked whether plaintiffs' half-hearted signature collection efforts would be sufficient to comply with Arkansas law. In finding that they would not be sufficient, it enjoined Arkansas' regime and imposed a requirement that it believed plaintiffs could meet solely because it believed plaintiffs could meet that requirement. That is not the standard for determining constitutionality and is not the standard for imposing relief and this Court should vacate the preliminary injunction accordingly. Your Honors, all ballot access challenges impose burdens and prevent parties and candidates from accessing the ballot. That's the point of a ballot access requirement, to ensure that only candidates and parties that enjoy a significant modicum of support or that are organized can access a ballot. The absence of non-viable candidates or disorganized groups from a ballot does not demonstrate an undue burden. To the contrary, only regulations that discriminate or freeze the two-party system by imposing regulations that a reasonably diligent third party could not be expected to meet are problematic. That's not surprising because it's hardly an undue burden to require candidates or parties to be organized or comply with the same laws and regulations as everyone else. Why isn't the September deadline you just described, the standard, troubling? In McLean 1, we found a deadline that was 150 days prior to the general election to be troubling. Your dealing here with something that's over 400 days, if I'm reading the record properly. If 150 is troubling, why isn't the 400 equally troubling and a severe burden here? I think it could be, but I think we have to look at the full context. I think we have to look at the full context and I think we have to look at what was true in McLean 1. So McLean 1, it wasn't, part of the problem was that the deadline was married with a requirement that was a much more demanding signature requirement than we have here. But even exempting that issue, at the time that McLean 1 was decided, primaries and elections just occurred, with the exception of the general election, occurred later than they do today. The deadline that was at issue in McLean 1, I believe, was a June 1st or June deadline. But wasn't the concern, or at least some of the concern, that it's, for these third parties, it's so far in front of the general election and that these third party support usually crystallizes late in the process? And how does that relate to the timing of the primary when these candidates, third party candidates, don't go through the primary? And you still have this general election concern now that's 400 days out. I think that there's a difference between candidates and parties. And I think a lot of the cases that deal with early deadlines are talking about candidates where, your Honor is correct, the support, like in Anderson, really crystallizes closer to the election. For a third party, especially a perennial third party like the Libertarian Party of Arkansas that is continuously seeking to gain ballot access, they're not going out and looking for support in that same sense. They're already seeking access to the ballot and that really does make a difference. But doesn't, isn't the confluence of factors that are involved here even make it a more aggravated standard to meet? Because you've limited it to a 90 day period to collect signatures that have to be filed 400 days before the general election. And if you put those things together, you've got people having to try and acquire signatures at a time when you're now a year and a half away from the general election. And even if you're a party, you've barely caught your breath since the last interim election. I think your Honor is correct that you have to consider the system holistically. And I think part of that is actually considering the fact that the signature requirement here, the threshold is so low, it's a 1.5% eligible pool requirement. And the District Court didn't analyze it as a 1.5% requirement. Counsel, can I ask just a clarification question? Is the 90 day kind of sliding term, is that new under the most recent version of the statute? I wasn't clear in reviewing the record. In other words, is that a new provision in the law, the 90 days for gathering signatures? It's not, Your Honor. Okay, thank you. But going back to the earlier point, I think you have to look at things holistically. And I think the fact that this is a 1.5% eligible pool requirement detracts from any ordinanceness that might be associated with those early deadlines, even if you believe that was true. And that's the way courts traditionally analyze these things, is looking at them holistically. The other distinction here is, under Arkansas' system, parties gain across the board ballot access. We're not talking about, for instance, in Genes where a candidate had to get 5% of all registered voters at the time of the last election to get on the ballot. And then there are a number of other states that require both parties and then candidates to individually access offices and to get signatures for each. And that makes Arkansas' requirement less burdensome overall. We also have a lower retention requirement than other cases or other states do. And that simply makes this case different, too. But if I could briefly return to the McLean point, I think so much has changed since McLean won. I mean, like I said earlier, one of the big things that's changed is the primaries are simply earlier now than they were before. Well, what difference does that make when the new party doesn't run in a primary? If they do it by convention. So what difference does it make to the Secretary of State if they put their names on the ballot after a convention that's in March or April? I think the difference is, Your Honor, is that Arkansas' system is set up to operate holistically and to ensure that all candidates are treated equally. So the reason why they are required to select their candidates by convention at the same time as the parties select their candidates by primary is because we want to treat all candidates equally. We want to address essentially the problem that existed in Anderson that treated some candidates differently than others. In other words, gave the major parties five months to decide on their nominees versus third-party candidates. So our system operates holistically to ensure that all those candidates are selected at the same time, whether it's a convention or it's a primary. The timing is still the same. And the timeline operates as well. Well, when's the primary? The primary is in March, right? That's correct, Your Honor. So the convention has to be – is that what the state statute says, that the convention has to be in March? They have to select their candidates by noon on the primary day. So it could be theoretically the day of the primary. It could be the day before. It's really up to them. But the deadline So why then do they have to get on the ballot the summer before? So why nine months before the primary date? So the timeline itself, if we look at it uniformly to ensure that everything works together, the timeline is designed to ensure that everybody gets equal treatment. So all of the candidates declare But I don't – okay, finish. I don't see why that makes any difference. Why – Well, again, it goes back to the Anderson point, Your Honor. We're treating all of the candidates the same. We require all of the candidates, whether they're third-party candidate or new-party candidates, independent candidates, write-on candidates, whatever the candidates are, they have to declare at the same time. And that ensures that nobody gets a unique advantage over anybody else. Again, it addresses the Anderson issue of making sure that everybody is treated the same. And when do they declare? Is that the first week in November? That's correct, Your Honor. What does that mean? I mean, is that a simple form that says, here's my name, I'm declaring myself a candidate possibly for a party or with a party? How does that work? That's essentially correct, Your Honor. They're filing a form that lists what office they're running to, provides their information. They agree to abide by Arkansas law. It's a relatively simple form. But the... So does that mean Michael Bloomberg cannot run in the Democratic primary in Arkansas? Mr. Bloomberg actually met the filing deadline in the state of Arkansas, Your Honor. But what did he do, file on the last day? I don't remember if it was the last day, but it was during the week-long party filing series. But if somebody wanted to jump in today, it'd be too late. I think that's right, Your Honor. But that's really not the issue in this case. We're not talking about candidates. That would be a totally different case. It's also true that some states select their signatures later than others. But really there, Your Honor, we're talking about candidates. Whereas here, we're talking about parties. Our system is designed to ensure that all parties are treated equally. That all party candidates announce their running at the same time. They select their candidates at the same time. And in order to make that system work, our deadline for submitting signatures for ballot access petitions is 60 days before that candidate filing period. That gives the state adequate time to verify the signatures and then potentially, on a less than expedited basis, adjudicate any disputes over the validity of certain signatures. And then it ensures by the time a candidate must decide to run for office, he or she knows what parties actually made the ballot and can make an informed decision about So is the state interest here really, I guess I'm struggling with what the state interest is. Is it, as a general matter, treating candidates the same? And I'm not saying that's a minimal interest, but is that the interest in requiring third party candidates or parties that are not qualified yet, or maybe just qualified by petition, to treat them similarly? Is that why they have to file in November? Is that the state's interest here? With respect to the candidates themselves, that's the primary interest. And that's also the interest in requiring the parties to file when they do, again, to address the issue of treating everybody the same. Anderson's a good example of this. Yeager is another good example of this. I think Judge Erickson's district court opinion in Yeager makes this point very well, that part of the problem with the North Dakota system that was at issue in McLean 1, for instance, was that they were treating Republicans and Democrats different from every other kind of candidate. They had, if you were a Republican and Democrat under the North Dakota system that existed at the time, you were automatically qualified for the ballot. You didn't have to meet a retention requirement. You didn't have to collect signatures. You didn't have to do anything by a specific date with those signatures in order to make the ballot. Your candidates, by virtue of being a Republican or a Democrat, were on the ballot. And everybody else was required to either meet a retention requirement or collect signatures by a certain date. And that detracted from the state's interest in requiring a modicum of support or having dates. And it just treated everybody differently. By contrast, Arkansas' system is designed to ensure that everybody receives equal treatment. Everybody's required to file at the same time. Everybody, Republican, Democrat, have to meet the retention requirements. And that's just a very different system than was true in McLean. Another distinction with McLean, because I think this is important, is, as I mentioned earlier, the primaries have certainly moved earlier than they used to be. Another important and critical difference on the timing is that it's simply easier to collect signatures now than it was at the time of McLean. And I think that's important. The First Circuit explained, for instance, in Gardner, that now we have rapid communications. We have social media. It is much easier for a group like the plaintiffs to locate people willing to sign, to locate enthusiastic volunteers, to reach out to them on social media. And that was the heart of the First Circuit's analysis in Gardner, was pointing out times have changed. That wasn't necessarily true in 1980. It wasn't even necessarily true in 1988. In fact, our expert below testified that, unlike even 10 years ago, politics now is a 24-7 business. I think that's demonstrated by the fact that Mayor Bloomberg has already filed in Arkansas. There have already been, in fact, before the time of the signature deadline of issue here, there have been two Democratic presidential debates and a third one followed quickly on the heels. That means the 2020 election cycle, by the time they were required to file, was in full swing. And that's just different from what was true 20, 30 years ago. And that makes a critical difference. If I can turn now briefly to the sort of signature threshold issue. So a reasonably diligent third party could comply with Arkansas' signature requirement. And I think courts have uniformly concluded that. Other circuits have uniformly said that. This court essentially said that in Yeager, when it upheld an eligible pool requirement of 1.33 percent. Here we're talking about 1.5 percent. There is no case from any circuit that I'm aware of, and they certainly haven't pointed out one in the briefing that would suggest a 1.5 percent eligible pool requirement is problematic. But the District Court didn't focus on sort of that abstract analysis. Instead, what the District Court did is it focused on plaintiff's resources. And it suggested that plaintiff's volunteer resources and financial base would be insufficient to meet Arkansas' requirement. But even if those claims were supported by the record, and we don't believe they are, that's not an undue burden. For instance, there was undisputed testimony below that a party like plaintiffs could comply with Arkansas' requirement by running a well organized and diligent collection effort for just $55,000. Now, Your Honors, $55,000 is not a severe burden in the context of ballot access or running an election campaign. And in fact, it's barely more than plaintiffs have spent in the past to obtain ballot access. And as the First Circuit pointed out in Gardner, in the context of a modern election campaign, which is a very expensive campaign, $50,000 is not a particularly shocking figure. And in fact, the Eleventh Circuit in Swanson reasoned that it wouldn't be an undue burden to require a party, and it wasn't an undue burden in that case to require a party to spend $100,000 on ballot access. And that's because, as this Court explained in Martin, elections are expensive. Running for office is expensive. It's part of what we can expect parties to do in order to participate in the process. The other thing that the District Court suggested was problematic here was the volunteer hours and base that would be required in order to comply. But the projections the District Court was making simply don't show a severe burden. So if we take the District Court's even using its super sponte hours calculations on how many hours volunteers would have to participate in order to comply with Arkansas law, the District Court merely suggested that over an entire 90-day period, each volunteer would have to dedicate 18 to 37 hours to comply with Arkansas law. Doing the math, Your Honors, that's two to three hours per week. I don't think that's a particularly demanding ask for a party that wants to cross the board ballot access. And even if you slash the projection of the number of people participating in the process in half, then you're talking about, I believe it's four to six hours per week if you did it by half. Again, not a particularly demanding ask. And it's something that a reasonably diligent party could be expected to do. And it's also not unreasonable to expect a group that they're not just competing for a single office, but multiple offices to be able to go out and get that kind of support to generate an enthusiastic base in order to collect signatures. And the District Court here simply didn't do that analysis. If I could briefly address the 90-day question, I know there have been a couple of questions about the 90-day window. Other courts, other circuits, and indeed the U.S. Supreme Court have held much more demanding requirements to be constitutional and not to impose a severe burden. So for instance in Genes, the United States Supreme Court held that requiring candidates to collect signatures equal to 5% of those who voted or those who were registered at the previous election in 180 days was not a severe burden. So that's double the amount of time here, but it's more than three times the signature requirement that Arkansas is actually requiring. And then in Tripp, the Seventh Circuit upheld a requirement that in order to obtain access, a candidate collects signatures equivalent to 5% of those who voted in the relevant district in the previous election in 90 days. Again, a much more demanding signature requirement, more than three times what we have here in 90 days. And the Supreme Court said that, or the Seventh Circuit said that wasn't problematic. Another point I wanted to briefly make is part of the district court's analysis here, what it ultimately did is it said that plaintiffs had failed to keep pace with what would be required in order to comply with Arkansas law and suggested because they couldn't keep pace with what was required, that made it problematic. The problem with that analysis, Your Honors, is what plaintiffs did here is not what a reasonably diligent third party would do. In fact, their efforts were anything but reasonable. They weren't organized in any sense. They didn't coordinate collection efforts, and I think this is borne out by the testimony. They didn't systematically follow up with volunteers. In fact, the Chairman of the Libertarian Party said he didn't know how many volunteers they even had. They didn't utilize the full 90-day window. They complained about the 90 days, but they didn't even utilize the full time period. They turned in a facially invalid number of signatures despite knowing they could roll that period forward. Perhaps most importantly, the individual plaintiffs here who one would expect to be among the most ardent supporters of the Libertarian Party, they did little to collect signatures beyond asking their spouse, their immediate family, and their next door neighbors to sign a petition. By the time of the hearing, two months after their petition drive had begun, we had officers in the Libertarian Party testifying they had collected just a handful of signatures and had no specific plans to collect more. That's simply not diligent. Indeed, if anything, their slapdash efforts here and their inability to meet Arkansas' requirement are the... So what's the legal significance of the lack of diligence? The required standard is what a reasonably diligent third party could do. The District Court used what they did and said, well, they can't meet it using this, therefore it's a problem. So the District Court applied the wrong standard. Unless there are any questions I'll reserve for rebuttal. Mr. Linger. May it please the Court, my name is James Linger. I represent the Appley Individual Plaintiffs and the Libertarian Party of Arkansas. I'd like to read one little thing that I want the Court to consider first off, and it is mentioned in the brief. And this is what the U.S. Supreme Court said in the Anderson v. Celebrezzi. Can you hold it up just a bit? Yes. Or maybe pull the microphone down just a little bit. I'm sorry. Because the interests of minor parties and independent candidates are not well represented in state legislators, the risk that the First Amendment rights of those scrutiny. There's another reason why this Court should do careful judicial scrutiny. The state of Arkansas has over and over passed laws that have been held unconstitutional as independent third parties. They then, after they declared unconstitutional, correct it. And then a number of years later, they come back and pass new unconstitutional laws. This has been recognized. In the genesis of this, though, an attempt to get to Super Tuesday, and Arkansas is not alone in moving their primary. I mean, is there any evidence that there's an unconstitutional motive here? I mean, it seems to me this is all turns on wanting to be on Super Tuesday so Arkansas gets presidential candidate visits. Super Tuesday is on the 3rd of March. The primary election is not until March 31st. And then there's a runoff, a general primary election after that. So Super Tuesday actually has no impact at all on this. That's not a reason to have all these oppressive requirements. And I think the Court has correctly noted in past decisions and in some of the questioning this morning, you don't just look at the number of signatures required. You also look at the deadline, the time you can collect those signatures, and the past history of success. And all those, I think, argue against what has happened here. Because individual requirements in these four standards alone, one of them or two of them might standing alone be constitutional. But when you put them all together, you have an incredibly oppressive law here. And what's amazing is when this was done and then the emergency was passed, so in effect when they realized it wasn't going to affect the Libertarians, you have something that's never been complied with. And I think that's very important. I think that was part of the appeal in passing this and trying to get it done through an emergency, is it had never been complied with. And in that regard... Well, let me make sure I understand how the statute works. I guess I was kind of like a super Tuesday, but it's tied to March 31st you say? March 31st is the preferential primary election. That is after super Tuesday. So if I want to run for the state legislature in Arkansas on the Republican or Democratic ticket, I have to file by what date? You have to file in November. There is a party filing period. And then you will be on the election on March 31st. If you do not get a majority of the vote, then there is a runoff later on, about a month later or so. And the point is, that's if you are an established party that got 3% of the vote for governor in the last election. Now the Libertarians got 2.9%, so they're back, which makes more sense for a minor party not to have a primary election but to have a state nominated convention. But then they don't participate in the primary at all. So the nominating convention has to be done by noon on the 31st, not by noon on super Tuesday. It's slightly less. They have until the voting goes to about 7 o'clock on March 31st. The party primary must be completed by noon. But it's not on super Tuesday. It's not, no. So I mean, that has no bearing on anything here. Of course, and I think one of the questions... Was the primary date changed at the time? I mean, I guess I was a little confused because I thought this all hinged on super Tuesday, but has the primary date always been March 31st? No, the primary date has been moved consistently over the years, back and forth. It's been in June, it's been in May, it goes back and forth. But we are, with our deadline in September, we're more than six months before the primary election. Actually, we're almost seven months. So the point of the matter is, that's something that's been condemned by the U.S. Supreme Court and by this court, having something so quickly because, once again, we're talking about minor parties. And while they say that a lot of people are really interested in politics, I think most of the testimony here and most of what we know is that the vast majority of people just aren't obsessed with politics, where they're constantly thinking about it. And as the Supreme Court has noticed, only when people get dissatisfied with the major parties do they start to look to third parties and independent candidates. This court, you know, I think on July 1st, a panel of this court, once again, on the deadline for independent candidates, which was put back on March 1st, and it was declared unconstitutional after it got reversed and sent back down for further findings. And then, as the Arkansas legislature has done continually, they mooted the case by passing new legislation to correct it. Of course, they waited until we'd filed our briefs and had oral arguments set, but the Eighth Circuit took the unusual step on July 1st of this year in Moore v. Thurston of refusing to vacate a moot decision in the district court because of the continual pattern of them changing these laws back to what was unconstitutional. Now, here, there have been two district court decisions in 96 and then in 2006, declaring the law unconstitutional. The first one was actually appealed. They ended up dismissing it after all the briefing had been done and there was oral argument set. And that is something I think you all ask if the 90 days was new. Actually, it is new from what it was in 2006 when the Green Party had their case in the district court because at that time you had 150 days to collect signatures. So, from that standpoint, once again, it's not only a worse, a much worse deadline than when you had deadlines anywhere from January to May of the election year, but the period of time actually collapsed by 60 days. Now, they made a point somewhat in their argument and also in their briefs about how maybe the Libertarians should have just kept collecting petitions. They didn't use all their time. Actually, they started on April 1st. They did collect signatures. It took them a while to get up steam on it. But when they turned in the signatures on June 28th, it was 89 days. The reason they turned them in on June 28th, almost 19,000 signatures, was because that was Friday. That was the last business day when the state offices were open. The district court issued its preliminary injunction three business days later on July 3rd. Why should they have continued and collected signatures? The 90 days shifts, right? I mean, if you're short at the end of the initial 90 days, you can continue circulating. It was my understanding, isn't that correct? They say that. There is another thing in the law that says that. When we had like the initiating petitions, if you turn them in and you don't have enough, you have a 30-day cure period. They don't have any applicable law to this. And of course, this was a terrible time to have to petition so far advanced in the election. The Libertarians made the decision. They actually thought July and August would be worse because of the temperatures and everything. Of course, they had to deal with tornadoes and flooding. I remember when I came down for the argument in early June, Tulsa, Muskogee, Fort Smith, Little Rock, they're all on the Arkansas River. Floods everywhere. I mean, they have a lot of problems. And that's one of the difficulties when you have a 90-day period. When you have bad weather or something occurs like tornadoes, it has an effect on that limited period. But they're not just like in Alabama where you have unlimited time and you have a deadline in June, the first Tuesday in June of the election year. We have such a little time to collect signatures. We have such an incredibly, the earliest date in the entire United States. And then we have a 3% requirement, 3% of the vote when the U.S. Supreme Court had previously said that 1% of the total vote for governor was on the outer limits. Now, that doesn't mean that 3% is unconstitutional. Isn't, wasn't the district court supposed to look at the voter pool here, though, and did that happen? And the state is arguing that when you look at the voter pool, this is closer to a 1.5%, which is within the range of what we've approved of. In and of itself, if you only look at that and don't consider the amount of time to collect But I'll tell you something, just looking at registered voters, I think it's better to look at the people who actually turn out to vote. Because as we all know, a lot of registered voters don't vote. We have sometimes 40 or 50 or 60%. But that's, that's not what we've held before. I mean, we've held that you look at the pool. In this case, it's registered voters, right? And that's right. And so essentially, do you agree it's, it's closer to 1.5%? Of the registered voters, some of whom are dead, some of whom have moved out of state, and some of whom don't vote. The best pool, I think, to look at is the number of people who actually come out and vote, the people who are more interested. Of course, that's how many people vote when there's actually an election, not 14, 15, 17 months before the election. In the cases in which we've, in the Supreme Court's looked at the voter pool, weren't they all cases in which you said that they had to exclude those people who had voted in the partisan primaries, right? No, there are, most states allow, allow anybody to sign the petition. There are some exceptions. I know Texas used to, if you voted in the primary, you couldn't find that. Of course, sometimes the primary vote in Texas was 6, 10, 15% of the voters. Some of them do that, but most of the states allow you basically to sign as many. You can sign, you don't have to say I'm going to vote for them. I get that, but didn't the remand, wasn't that, weren't the underlying facts in that case a case in which they said you had to get the votes from people either who had not voted in those other primaries? Am I wrong? Well, in which case is that, Your Honor? I'm... There may be one, there may be, you have to look at that. That is a factor. If you say you can only sign one petition or you can't vote in the primary, that would be another factor that would make it more restricting. I read the case yesterday and I just don't remember the name of it now, I'm sorry. There is a case like that, Your Honor, whatever it is. But the point of the matter is that's one factor to consider just as the deadline, the past history of success, the amount of time that you have to collect the signatures and the total number. We know that this number, though, is, as the U.S. Supreme Court said, when it said 1% of the vote cast for governor, as in the outer amounts that can be asked, that just means that's one of the more restricting. It doesn't mean in and of itself it's not restricting. But then with the deadline, in Anderson v. Celebrezzi, it was only 5,000 petition signatures, but it was the deadline. Would you address the scope of the injunction here? It seems to me that the district court was most concerned with the early deadline. I think it was. And, Mike, I mean, as the State argues here, that's the one thing that the injunction doesn't change. It addresses the modicum of support, it does other things. It enjoins other provisions. But it didn't address the timing. Now, is that my understanding accurate? And the argument, as I take it, is that the injunction was not narrowly drawn and should be reversed on those matters. I think it is narrowly drawn because it was being very cautious and conservative in what is going to be the least disruptive thing. The judge just didn't make up the 10,000 signatures. That's what the law had been for like five or six election cycles, operating totally properly. And if the court had said, well, I want you to have a year to collect these signatures or I'll put the deadline in January or July or, you know, whatever, that would have been more disruptive. I think the court should always be cautious to try to do something that will be easily understood and will not be so disruptive. So I'm saying that I think the court was just absolutely correct in the way they handled it because it looked at what the law had been until late February. Although, actually, the law, even if you had 10,000 signatures, would be worse because you'd still have this six or seven month or more earlier petition deadline. So I'm just saying I think the court acted properly and the court set forth its reasons on why it chose to act like this. And the almost 19,000 signatures they turned out, I think you all got the 28J letter when we found out that the Secretary of State had messed up and had given us the wrong number of valid signatures. Instead of 12,749, it was actually 14,779. And that shows what the libertarians had done in collecting signatures. They were much more successful than they had been two years before. They had a high validity rate. Dr. Paco had testified about how careful they had been in checking the signatures and what they had worked on. And while they scoff about the money they spent, I mean, it was a lot for a minor party to do this. And they have done this successfully for the last four election cycles. And this is so restricting. Not only was the 3% never complied with, but the Green Party has basically hasn't been able to do it. Dr. Paco testified about that. He had talked to people in the Green Party. They weren't able to do it. That was the 10,000 signature requirement, let alone the 3%. And this court itself, back in 2011, when they had the Green Party case, talking about the retention requirement of 3% of the vote for governor or president, this court specifically in holding that said, but you can get back on the ballot with the 10,000 signatures. That was what is accepted by this court. That was an acceptable modicum of support. And I think the district court acted very conservatively when it put that in effect as to what it was going to require. And the Libertarians, when they turned that in on the last business day in June, Friday, June 28th, Wednesday, three business days later, they had their decision. There was no reason for them to keep collecting signatures on something that might or might not have been allowed and something that was a great burden on them. This court in the McLean v. Meyer cases recognized that this is a burden. And we contrast what happened with the 1980 McLean case with what happened eight years later in 1988. North Dakota there chose to lower the signatures by more than half. In what case do we have that has been upheld where a state, when a system was working properly, when there weren't the ballot being overflowed with choices, third parties, or in Arkansas' case, we don't even have the Democratic Party contesting a majority of a lot of the seats. And, you know, in a situation like that, what state tries to come back, not just with something that is substantially worse, which has the worst deadline in the country, which only allows 90 days to collect the signatures, and has picked something that's previously in a more mild form by deadline and time to collect signatures, has been twice declared unconstitutional. And once, when there was an appeal to the Eighth Circuit, and then they was to be considered, in all respects, the prevailing party. I think that is very significant. The district court did not, in its decision, say that it was making a ruling because they thought one of the political parties had done this for purposes to protect themselves. However, I would say that the circumstantial evidence certainly suggests that, but it wasn't part of the decision. And that, of course, is what the Supreme Court has warned against, where we must look to protect minority parties and independent candidates. They don't simply have the power to do that and control things. And none of us should be surprised that when you have power, you will try to use it to your advantage. There's nothing unusual about that. It's simply a matter of common sense. And so, I think in those regards, this law is clearly unconstitutional. I would say, and I would suggest to you, the evidence and the facts and the history suggest that it is overwhelmingly unconstitutional. And in that regard, I think what the district court did was the appropriate thing. It should be noted that 10,000 signatures is actually more than 1% of the last vote for governor in Arkansas, which, of course, is a factor. But coupled then with the deadline, with the time to collect signatures, and with the fact that no one ever complied with this for decades and decades, I think that is what causes us to condemn this law. And I just can't see what else the district court could have done because everything else, I think, would have been worse if they just said, why don't you just collect signatures until March 1st or something, March 31st, or why don't you just keep on collecting signatures, even though there was a preliminary injunction on July 3rd. Unless the court has any other questions, that's what I would suggest, that this court affirm the decision of the district court in its granting of the preliminary injunction. I don't see any questions, so thank you. Thank you. Mr. Brani, your rebuttal? There were a series of questions about the date for selecting candidates. The date for them to select candidates by is Super Tuesday. But even if Mr. Linger were correct and it were later, they would still ultimately select their final candidate by the same date. But the primary is the end of March, right? The primary is Super Tuesday, the start of March. There is a runoff, Your Honor, at the end of March. It says here the primary will be four weeks after the preferential. What's the preferential primary? The preferential primary is what we all think of as a primary. It's just a weird clerk in Arkansas statute about the way they write it. But the primary is Super Tuesday. That's the real primary that we're talking about here. The runoff primary is what the statute refers to as the primary. That's the March deadline. That's the general primary? That's right, Your Honor. That doesn't appear to be what the statute says, but I don't think it is. Either way, it ultimately wouldn't matter because they're required to pick their candidates at the same time as everybody else. On the timing issue, what essentially Mr. Linger is suggesting, that the timing was so burdensome that they decided to comply early. You're not really in a good position to make that argument if you turn in your signatures two months in advance of when you're actually required to turn them in. And then ultimately, the district court's decision here really seemed to rest on the timeline and that seems to be where Mr. Linger's argument is. The district court even suggested that Arkansas would fail rational basis on the timeline, but it left that statute that it suggested would fail rational basis in place and instead reached out and grabbed and enjoined a requirement that everybody agreed would be upheld anywhere else. Thank you. Thank you very much for your arguments. The case will be taken under advisement. The court will call the next.